IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VICKIE E. JOYCE,                        )
                                        )
                    Plaintiff,          )
                                        )
        -versus-                        )        Civil Action No.: 1:06CV00027
                                        )
MICHAEL J. ASTRUE,[1]                   )
Commissioner of Social Security,        )
                                        )
                    Defendant.          )

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Vickie E. Joyce, brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and widows' disability benefits under Title II of the Social Security Act (the "Act").  The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

## Procedural History

Plaintiff filed applications for Disability Insurance Benefits (DIB) and Disabled Widows Benefits (DWB) on September 30, 2003, alleging a disability onset date of

---

[1]    Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he should be substituted for Jo Anne Barnhart as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

December 2, 2002.  Tr. 150, 776.  The applications were denied initially and upon reconsideration.  Tr. 94, 95; 780, 785.  Plaintiff requested a hearing <u>de novo</u> before an Administrative Law Judge (ALJ).  Tr. 104.  Present at the hearing, held on March 29, 2005, were Plaintiff, her attorney, a medical expert (ME) and a vocational expert.  Tr. 36.

By decisions[2] dated July 29, 2005, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 11, 25.  On November 16, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 7), thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.[3]
>
> 2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

---

[2]    The ALJ issued separate decisions for both Plaintiff's DIB and DWB cases, but the decisions are essentially identical for the purposes of this Recommendation.  <u>See</u> Tr. 25. The transcript citations for only the DIB decision will be included herein.

[3]    In the DWB case, this finding reads:  "The claimant meets all of the nondisability requirements for Disabled Widow's Insurance Benefits set forth in Section 202(e) of the Social Security Act (with the exceptions noted in 20 CFR § 404.335(e)).  The claimant's prescribed period begins December 2, 20022 [sic] and ends April 13, 2010."  Tr. 33.

3. The claimant's obesity; atrial fibrillation under generally good control with medical regimen; major depression, recurrent; and panic disorder with agoraphobia, in remission are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: lift and carry up to 50 pounds occasionally and 25 pounds frequently; sit for about 6 hours of an 8-hour workday, and stand/walk for at least 6 hours of an 8-hour workday.

7. The claimant's past relevant work as manager of [a] beauty shop did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable obesity; atrial fibrillation under generally good control with medical regimen; major depression, recurrent; and panic disorder with agoraphobia, in remission do not prevent the claimant from performing her past relevant work.

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

Tr. 19 (footnote added).

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ failed:

3

(1) to articulate Plaintiff's functional limitations as required by 20 C.F.R. Section 404.1520a, and to support her decision to adopt the "B" criteria found by the state experts;

(2) to explain her determinations why Plaintiff's impairments were severe and why they failed to meet a listing;

(3) to address Plaintiff's impairments of diabetes, sleep apnea, osteoarthritis, and fibromyalgia, and to explain why she omitted them from Plaintiff's residual functional capacity (RFC) assessment;

(4) to address the opinions of Plaintiff's treating physicians;

(5) to evaluate Plaintiff's subjective symptoms and credibility;

(6) to include a narrative discussion describing how the evidence supports each conclusion of the RFC assessment.

The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

Scope of Review

The Act provides that, for "eligible"[4] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

---

[4] Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for DWB at 42 U.S.C. § 402(e).

4

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration (the "SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must determine whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. 20 C.F.R. § 404.1520.[5]

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

---

[5] All regulatory references will be to Title 20 of the Code of Federal Regulations (C.F.R.).

<u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. <u>Thomas v. Celebrezze</u>, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. <u>Blalock v. Richardson</u>, 483 F.2d 773, 775 (4th Cir. 1972).

Of particular interest in this case is the factfinder's general duty of explanation. The statutory duty is found in the Act:

> Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C. § 405(b)(1).

The Fourth Circuit has incorporated this duty into a number of its cases. In <u>DeLoatche v. Heckler</u>, the court held, "The Secretary must present us with findings and determinations sufficiently articulated to permit meaningful judicial review." 715 F.2d 148, 150 (4th Cir. 1983). In <u>Gordon v. Schweiker</u>, 725 F.2d 231 (4th Cir. 1984), it explained why the duty was so crucial:

> The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to

6

say that his decision is supported by substantial evidence approaches
an abdication of the court's "duty to scrutinize the record as a whole to
determine whether the conclusions reached are rational."

Id. at 236 (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)).  As

discussed in Plaintiff's brief, this duty is also explicitly set forth in several of SSA's

Rulings.[6]  See, e.g., Social Security Rulings (SSRs) 96-5p, 61 Fed. Reg. 34471-01;

96-8p, 61 Fed. Reg. 34474-01.  The reviewing court requires the factfinder "to build

an accurate and logical bridge from the evidence to her conclusions so that we may

afford the claimant meaningful review of the SSA's ultimate findings."  Blakes ex rel.

Wolfe v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003).

That said, not all omissions render a decision reversible.  Kurzon v. United

States Postal Service, 539 F.2d 788 (1st Cir. 1976), contains an excellent explication

therefor:

While agency decisions must be sustained, if at all, on their own
reasoning, this principle does not mechanically compel reversal when
a mistake of the administrative body is one that clearly had no bearing
on the procedure used or the substance of decision reached.  Where
a subsidiary finding is unfounded, the court will remand the case to the
agency for further consideration only if the court is in substantial doubt
whether the administrative agency would have made the same ultimate
finding with the erroneous finding removed from the picture.

Id. at 796 (1st Cir. 1976) (internal citations omitted), quoted in Pechatsko v.

Commissioner of Soc. Sec., 369 F. Supp. 2d 909, 912 (N.D. Ohio 2004).  This

---

[6]   SSA has established that its Rulings "are binding on all components of [SSA].
These rulings represent precedent final opinions and orders and statements of policy and
interpretations that we have adopted."  § 402.35(b)(1).

7

doctrine furthers the interest of judicial economy: "The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time."  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) (citing Gulf States Utils. Co. v. Ecodyne Corp., 635 F.2d 517, 520 (5th Cir. 1981)).

Although the court could not find a Fourth Circuit SSA case which addresses it, this doctrine is utilized by the other Circuits.  See, e.g., Sanchez v. Barnhart, 467 F.3d 1081, 1082 -83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the  reviewing court to upset the agency's decision."); Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006) (applying the doctrine when "the ALJ's error, if any indeed existed, was inconsequential to the ultimate nondisability determination"); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless."); Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) ("We have generally recognized the applicability of this principle in the administrative review setting."); Ward v. Commissioner, 211 F.3d 652, 656 (1st Cir. 2000) ("there was no harm from the ALJ's use of an erroneous ground of decision because there was an independent ground on which affirmance must be entered as a matter of law"); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (the court will not set aside an administrative finding based on an "arguable deficiency in opinion-writing technique" when it is unlikely to have affected the outcome).  See also Krishnan v. Barnhart, 328 F.3d 685, 694 (D.C. Cir. 2003); Heston v. Commissioner of Soc. Sec.,

245 F.3d 528, 535 (6th Cir. 2001); <u>Mays</u>, 837 F.2d at 1364; <u>Matullo v. Bowen</u>, 926 F.2d 240, 247 (3d Cir. 1990); <u>Murray v. Heckler</u>, 737 F.2d 934, 936 (11th Cir. 1984); <u>Felshina v. Schweiker</u>, 707 F.2d 71, 74 (2d Cir. 1983).

Thus, this court generally agrees that, despite statutory or case law, or Ruling mandates, it will not remand unless there is a possibility that the claimant could be awarded benefits should the error be corrected. <u>See, e.g.</u>, <u>Ward</u>, 211 F.3d at 656 (an error of law will not necessitate a remand "if it will amount to no more than an empty exercise").

Pertinent Evidence Presented

As of the date of the ALJ's decision, Plaintiff was fifty-five years of age. <u>See</u> Tr. 15. The ALJ found that she has a high school education and past relevant work as the manager of a beauty shop and as a hairdresser. According to the ALJ, Plaintiff initially alleged disability due to heart disease, diabetes, ulcers, esophagus problems, osteoarthritis, fibromyalgia, depression, panic attacks, and atrial fibrillation.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability (AOD). She also determined that Plaintiff met the disability insured status requirements of the Act and continued to do so through the date of the ALJ's decision. Although the ALJ found the medical evidence to establish that Plaintiff suffered from several severe impairments, she concluded that none of those impairments met or equaled any of the Listing of Impairments.

9

1. Mental Impairments

Plaintiff complains that, although the ALJ found that she suffered from two "severe" mental impairments, "the ALJ failed to articulate the functional limitations imposed by" those impairments, "as required by [§ 404.]1520a." Pl.'s Br. at 4. Under the regulations, an impairment is "severe" when it "significantly limits" a claimant's physical or mental abilities to perform basic work activities. See § 404.1521(a). Mental "basic work activities" include understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. § 404.1521(b).

The regulations provide that, upon a finding of severity, the ALJ's decision "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." § 404.1520a(e)(2). In the instant case, the ALJ described a letter from Plaintiff's treating psychiatrist, Dr. L. C. Dekle, which

> revealed that the claimant had been a patient and was diagnosed with major depression, recurrent; panic disorder with agoraphobia; and adjustment disorder with depressed mood, severe. It was noted that the claimant had been compliant with all treatment recommendations and appointments; however, she continued to experience episodes of depression and anxiety. It was noted that her present lack of financial resources was a major source of emotional distress and had further exacerbated her symptoms and complicating [sic] her treatment.

Tr. 16-17 (citing Tr. 682).

10

The court finds no error. Plaintiff's medical records for the relevant period (from her AOD through the ALJ's decision) include some fifteen from her mental health caregivers. Generally, they reveal a pleasant and relaxed woman, whose mental ailments, for the most part, were in remission or stable. See, e.g., Tr. 511-12, 683, 690. Even when Plaintiff experienced a period when she admitted depression, she was only "mildly depressed in aspect," Tr. 509, and her caregiver found that she was not immobilized by depression, Tr. 508.

At one point, Dr. Dekle stated that Plaintiff was "doing well enough emotionally," although she was "saddled with an enormous amount of financial and other stressors." Tr. 691. The doctor opined that her "[c]hronic pain" was disabling but mentioned no mental limitations, observing that she "look[ed] well." Tr. 690-91. Plaintiff's mental condition eventually improved, with the caregiver noting "[n]o anxiety, no depression" in August 2004, although Plaintiff continued to complain of "terrible" financial problems and "unremitting" chronic pain. Tr. 690. A review of Plaintiff's records supports no greater limitations than as suggested by Dr. Dekle's letter.

Plaintiff complains the ALJ adopted, without explanation, the findings required by subsections 404.1520a(c)(3)[7] and (e)(2)[8] as made by the state agency experts. See

---

[7] "We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."

[8] "The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section."

11

Tr. 654, 665. But, again, the court sees no error, as Dr. Dekle's letter supports no greater limitations than as found by the experts. To the extent Plaintiff perceives a procedural problem here, the court sees no reason to remand, as she has failed to allege any prejudice. See, e.g., Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988) ("'This court will not vacate a judgment unless the substantial rights of a party have been affected.'") (quoting Mays, 837 F.2d at 1364)).

2. The Listings

Plaintiff argues the ALJ failed to evaluate if she either met or equaled mental health Listings 12.04 and 12.06. The "Listings," found at Part 404, subpart P, Appendix 1 (part A), are "a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.'" Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)). When a claimant satisfies a Listing by meeting all its specified medical criteria, she presumably qualifies for benefits. See id. To demonstrate equivalency, the claimant "must demonstrate that his 'specific medical signs, symptoms, or laboratory test results' equal those for a disability that happens to be listed." Id.

Both the sequential evaluation procedure (cited at page 5, supra), and section 404.1520a require, once an impairment has been found to be severe, that the factfinder determine if it meets or equals one of the Listings. Plaintiff contends that subsection 404.1520a(d)(2) "requires that the presence or absence of the criteria will be recorded in the decision," Pl.'s Br. at 6, but she is only half right. That subsection provides, in relevant part,

12

We will record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, *or* in the decision at the [ALJ] hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision).

Id. (emphasis added).

In this case, "the presence or absence of the criteria" is incorporated into SSA's form "Psychiatric Review Technique." State agency consultant Dr. Susan Stevens completed this form at the initial level. See Tr. 655. She found that Plaintiff suffered from medically determinable impairments (major depression and adjustment disorder) that did not precisely satisfy the diagnostic criteria for Listing 12.04(A).[9] Tr. 658. Dr. Stevens also determined that Plaintiff suffered from another medically determinable impairment (panic disorder with agoraphobia) that did not precisely satisfy the diagnostic criteria for Listing 12.06(A). Tr. 660.

As to both Listings, the doctor concluded that Plaintiff suffered no marked limitation as to their paragraph B criteria. Specifically, Dr. Stevens found that

---

[9] Each [Mental Disorder] listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

Pt. 404, Subpt. P, App. 1, § 12.00(A).

13

Plaintiff was only mildly limited in her activities of daily living and in maintaining social functioning; and moderately limited in maintaining concentration, persistence or pace. Also, Plaintiff had undergone no extended episodes of decompensation. Last of all, the doctor determined that Plaintiff's medical records did not establish the presence of these Listings' "C" criteria. Tr. 666. Thus, Dr. Stevens's report, completed at the initial levels of the administrative review process, satisfied the requirements of subsection 404.1520a(d)(2). The court finds no error.

3. Severity

Plaintiff asserts that the ALJ should have found her diabetes, osteoarthritis, fibromyalgia, and sleep apnea to be "severe" impairments based on the effect they have on Plaintiff. In order for physical impairments to be found severe, they must have more than a minimal effect on the basic work activities of walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. See § 404.1521(b)(1). Plaintiff refers to several transcript citations, which the court will address seriatim.

Plaintiff first refers to three general practitioner visits, in March, April, and May of 2002. See Tr. 418-19. She complained of left shoulder pain and said that she had been diagnosed by a second physician[10] with "arthritis." Tr. 418. The doctor prescribed Vioxx, a nonsteroid anti-inflammatory, and Flexeril, a muscle relaxant. Plaintiff subsequently reported that Flexeril did not help, but physical therapy did.

---

[10] A Dr. Keeling; there are no corresponding medical records.

14

Tr. 419. These complaints, however, pre-date Plaintiff's AOD; she continued to work (see, e.g., Tr. 617), and there is no other medical record containing a complaint of shoulder pain.

Plaintiff next refers to a caregiver visit in September 2003, where she complained that she "[h]urts all over[,] knees, hips. Back." Tr. 440. Yet she reported that ibuprofen, an over-the-counter pain reliever, "[t]akes the edge off." Id. Her exam revealed "multiple trigger points" on her back, but no synovitis. Id. Plaintiff's diagnoses were osteoarthritis and, possibly, fibromyalgia.[11] Yet this is the only time in Plaintiff's hundreds of pages of records that a caregiver makes a fibromyalgia diagnosis.[12]

Specifically, on Plaintiff's first visit to the "Internal Medicine Continuity Clinic," Dr. Tejaswi Sastry listed seven diagnoses, but she did not include fibromyalgia. See Tr. 760. When Dr. Sastry prepared a letter on Plaintiff's behalf, she did not mention fibromyalgia. See Tr. 775. In none of Plaintiff's SSA submissions did she discuss fibromyalgia. See Tr. 165-99. During her hearing, Plaintiff failed to link fibromyalgia to any of her limitations. See Tr. 41-76. Accordingly, the court cannot conclude that the ALJ erred in not finding fibromyalgia to be a severe impairment. Cf. Tr. 81 (ME

---

[11]   The caregiver noted only "FM." Tr. 440.

[12]   On August 18, 2004, a physician noted that Plaintiff "has had pain probably related to her fibromyalgia," yet he made no reference to this pain or to this ailment in his diagnoses, and no finding of trigger points during his examination. Tr. 707.

noting that "there really is no medical[ly] determinable diagnosis of fibromyalgia beyond basically history").

Plaintiff's diagnosis of sleep apnea came late in the relevant period, as documented by her reference to medical records dating from August through November 2004. See Tr. 704-07. She initially presented to Dr. James Hochrein with multiple complaints, including chronic shortness of breath, fatigue for one month, and difficulty sleeping. Tr. 707. Plaintiff also claimed that she snored loudly, and had been told that she stops breathing. Tr. 708. Her examination was unremarkable. Dr. Hochrein ordered a sleep study, and noted, "She understands the need to lose weight with diet and exercise." Id.

Plaintiff returned two months later, seeing Dr. Keith Clance. She was four pounds heavier. See Tr. 703. For the first time, Plaintiff complained that she awakened "quite a bit at night," did not feel rested upon rising, and experienced "significant periods of sleepiness during inactivity and also while driving that she feels is adversely affecting her quality of life." Id. She added that she fell "asleep in the evening with TV or movies." Id. The doctor interpreted Plaintiff's polysomonography to show moderate to severe obstructive sleep apnea, and advised treatment with CPAP[13] and weight loss. Tr. 704.

---

[13] An abbreviation of "continuous positive airway pressure," CPAP is "a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit." Stedmans Medical Dictionary 421, 1442 (27th ed. 2000).

16

Plaintiff's next sleep apnea-related visit took place the following month. She had gained an additional two and a half pounds. See Tr. 700. Plaintiff reported that she had not been able to utilize the CPAP device due to severe nasal congestion. Dr. Clance noted that she "[r]eally hasn't given CPAP a fair shot." Id. He concluded that they needed to get Plaintiff's nasal passages open in order to increase her compliance.

Interestingly, Plaintiff's Brief does not refer to her next follow-up with Dr. Clance, in December 2004. She was up another two and a half pounds, now at 238. See Tr. 696. Plaintiff's sinuses were "much better," and when she wore the CPAP device, she "definitely fe[lt] better." Id. The doctor advised a modification to the device and a different mask to increase its efficacy, and also weight loss. He planned the next follow-up for four months.

As there is every indication that Plaintiff's recent symptoms will abate with proper use of the CPAP device, the ALJ did not err in finding her sleep apnea was not severe. See Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996) (impairment that improved with only mild medication found not to be severe). Cf. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling." (citations omitted)); § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). In addition, Plaintiff's treating physician opinion does not list sleep apnea among her

17

"multiple medical problems," see Tr. 775, and Plaintiff's testimony did not include complaints of daytime sleepiness or fatigue.

Plaintiff further refers to a September 21, 2004, complaint of back pain of five days duration. See Tr. 757. The caregivers agreed that the pain "was probably a dermatomal[14] kind of neuropathic pain secondary to [Plaintiff's] diabetes." Id. (footnoted added). They prescribed Elavil, an antidepressant. Generally, however, they found Plaintiff's diabetes "to be under reasonable control." Id. When Plaintiff returned the next month, it was noted that her back pain "seem[ed] to be resolving with the Elavil," and her diabetes was "under good control." Tr. 754.

Plaintiff received her diagnosis of diabetes on August 15, 2003. See Tr. 473. The next mention is not until July 2004, upon Plaintiff's first visit with Dr. Sastry, who noted that Plaintiff's diabetes was presently "diet controlled." Tr. 760. Plaintiff's blood glucoses thereafter were generally good. See, e.g., Tr. 714, 746, 751, 755, 759. In August, her eye doctor noted that Plaintiff's diabetes was diet-controlled, and her blood sugar was stable. Tr. 742. Apparently, he found no diabetic changes of her eyes. See Tr. 756. At one of her last record visits, the caregiver deemed her diabetes "well-controlled." Tr. 747. Accordingly, the ALJ did not err in finding Plaintiff's diabetes not severe.

---

[14] Dermatome: "The area of skin supplied by cutaneous branches from a single spinal nerve; neighboring dermatomes can overlap." Stedman's Medical Dictionary 481 (27th ed. 2000).

Plaintiff's remaining references are to complaints of diffuse pain. On February 11, 2004, she told her psychiatrist that "[h]er arthritis is hurting her so much that she cannot work." Tr. 691. On December 6, 2004, Plaintiff complained of finger joint pain that "ha[d] been going on for quite some time," and also of hip, back, and neck pain. Tr. 750. Also, in August 2004, her psychiatrist reported that Plaintiff's "chronic pain continues unremitting." Tr. 690. Throughout the relevant period, Plaintiff's caregivers recorded her reports of pain of differing severity, in various locations. See, e.g., Tr. 374 (hip, back); 440 (knees, hips, back); 441 (left knee, ankle, foot); 450 (back, lower legs); 451 (ankles); 707 ("diffuse pain," particularly in back); 745 (all joints); 750 (right hip, finger, back, neck); 754 (finger and toe joints).

As previously noted, in two instances caregivers possibly attributed Plaintiff's pain to fibromyalgia, but there is no indication that this diagnosis was sustained. On several occasions, caregivers mentioned osteoarthritis in relation to Plaintiff's pain. See, e.g., 440, 451 (hands), 745, 750, 760; see also Tr. 775. Yet not until late in the relevant period did a caregiver prescribe anything stronger than Darvocet, a mild narcotic pain reliever, to treat Plaintiff's pain.[15] See Tr. 58; 745 ("Darvocet RB Extra"). Generally, Plaintiff took either an over-the-counter medication or infrequent Darvocet for her joint pain. See, e.g., Tr. 197, 440, 750, 756, 762. Dr. Sastry even

---

[15] One doctor noted that Plaintiff had taken prednisone for her arthritis, Tr. 432, but indications are that a different doctor prescribed prednisone when sarcoidosis was suspected, see Tr. 443-44.

noted that Plaintiff "does not require much pain medications" for her osteoarthritis. Tr. 760.

Further, Plaintiff's activities were inconsistent with reports of "unremitting pain." In May 2003, she complained of stiff and sore knees after lifting "a lot of boxes." Tr. 433. As late as July 2003, she stated that she was working fifty hours per week. See Tr. 522. An agency contact, in November 2003, revealed that Plaintiff tried to get out at least daily, often going to a friend's house. Tr. 162. In April 2004, Plaintiff reported that the most exertional thing she did was vacuum. Tr. 543; see also Tr. 715 (Plaintiff gets short of breath while vacuuming).

Medical records fail to reveal observations about Plaintiff's limitations from pain. In July 2004, Plaintiff began receiving treatment at clinics through the Moses Cone Health System. Their forms contain checklists for "Functional Status" and "Ambulation." On each of nine visits, the records indicate that Plaintiff's ambulation was normal. See Tr. 745-62. On only one visit is there an indication that Plaintiff's ability to "Self care" had changed, but there is no showing why, as Plaintiff complained only of an upper respiratory infection. See Tr. 759. Otherwise, Plaintiff was able to cook, clean, shop, and engage in social activities.

Thus, Plaintiff's statements are the only evidence that her ability to engage in work activities was affected by osteoarthritis.[16] Consequently, whether Plaintiff's

---

[16]  As to Plaintiff's osteoarthritis, the ME testified that Plaintiff's doctor was

(continued...)

20

osteoarthritis is a severe impairment is based on her credibility, a question the court

takes up on pages 26 through 30, <u>infra</u>.[17]

4. Treating Source Opinion

"Courts typically 'accord greater weight to the testimony of a treating physician

because the treating physician has necessarily examined the applicant and has a

treatment relationship with the applicant.'" <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th

Cir. 2006) (<u>quoting</u> <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005) (internal

citation omitted)). The governing regulation, however, makes clear two issues that

are dispositive in Plaintiff's case.

First, it defines "medical opinions" as "statements from physicians and

psychologists or other acceptable medical sources that reflect judgments about the

nature and severity of your impairment(s), including your symptoms, diagnosis and

prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions." § 404.1527(a)(2). It further provides that "opinions on issues reserved

---

[16](...continued)
listing that as kind of a default diagnosis trying to explain the multiple symptoms that the patient has. We do not have extensive x-rays of her joints, although we have many x-rays of her shoulders. We have CT scans. We have x-rays of other organs, but we do not have specific x-rays dealing with the arthritic problem.

Tr. 73.

[17] Plaintiff adds that there is no showing the ALJ considered these impairments in assessing Plaintiff's RFC "as required by [SSR] 96-8p." As Plaintiff does not indicate how the ALJ failed to comply with this Ruling, the court will not address this claim.

to the Commissioner" are not afforded any special significance "because they are administrative findings that are dispositive of a case." §§ 404.1527(e) & (e)(3).

Plaintiff's treating psychiatrist, Dr. Dekle, submitted a letter that listed her diagnoses and said that Plaintiff had "been compliant with all treatment recommendations and appointments." Tr. 682. The doctor explained that Plaintiff was

> continuing to experience episodes of depression and anxiety. Her present lack of financial resources is a major source of emotional distress for this patient and has further exacerbated her symptoms, complicating treatment. Patient has made attempts to work in the past but is unable at this time to sustain herself by employment due to her present emotional and physical problems.

Id.

> Plaintiff's letter from Dr. Sastry is in the same vein:

> Ms. Joyce has been a patient of mine since July '04. She is a very pleasant individual with multiple medical problems which include [diabetes mellitus, hypertension], atrial fibrillation, hypothyroidism, and osteoarthritis which is [sic] debilitating her.

> Due to her multiple medical problems she has been finding it increasingly difficult to work. I fully support her application for disability.

Tr. 775.

Although the letters state the nature and severity of Plaintiff's impairments, they fail to list symptoms or prognosis or, most significantly, what Plaintiff can still do despite her impairments and her physical or mental restrictions. Moreover, they

opine on an issue reserved to the Commissioner – whether Plaintiff is able to work. Accordingly, they are due no special significance.

Plaintiff argues that, even so, the ALJ is required to consider these opinions and to articulate her assessment. Plaintiff is correct; even when a treating source has offered an opinion on an issue reserved to the Commissioner, the ALJ must explain the consideration given to such opinion. SSR 96-5p, 61 Fed. Reg. 34471-01, 34474. Ruling 96-5p also provides that, "[i]n evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d)," id. at 34473, namely: (i) length of the treatment relationship and frequency of examination, (ii) nature and extent of the treatment relationship, (iii) supportability- i.e., adequacy of explanation for the opinion, (iv) consistency with the record as a whole, (v) whether the treating physician is offering an opinion on a medical issue related to his or her specialty, and (vi) other factors highlighted by the claimant or others.

The court concedes the ALJ erred in not specifically addressing these opinions but finds such error harmless, as neither doctor made any attempt to support their disability opinions. In addition, neither opinion is supported by the record. Aside from a short-lived episode, Plaintiff's medical records show her mental impairments to be in remission. Plaintiff's blood sugars and blood pressures have been uniformly good. There are at least forty-five blood pressure readings in the

23

transcript, and on just one occasion was Plaintiff's blood pressure over 140/90.[18]  As discussed above, there is only one time where it appears that Plaintiff's diabetes may have compromised her health, and that instance was short-lived.

Throughout the relevant period, Plaintiff had several episodes of atrial fibrillation,[19] but there is no showing that it had any ill effects.  Her caregivers noted that Plaintiff's atrial fibrillation was managed with aspirin and rate regulating medications.  See Tr. 434, 543, 745.  In August 2004, her doctor assessed her rate control as "good."  Tr. 708.  A somnogram later that month revealed Plaintiff's atrial fibrillation had a controlled ventricular response.  Tr. 729.

Apparently, Plaintiff received a diagnosis of hypothyroidism some time before her AOD, see Tr. 491, and was off of thyroid medication approximately eighteen months before resuming just prior to her AOD, see 481, 483.  Her medical records reflect no ill effects from her thyroid condition.  As to Plaintiff's osteoarthritis, which is discussed in detail above, Dr. Sastry treated Plaintiff for about six months before prescribing anything stronger than Darvocet.

_____

[18]   "Blood pressure below 120 over 80 mmHg (millimeters of mercury) is considered optimal for adults.  A systolic pressure of 120 to 139 mmHg or a diastolic pressure of 80 to 89 mmHg is considered 'prehypertension' and needs to be watched carefully.  A blood pressure reading of 140 over 90 or higher is considered elevated (high)."  American Heart Ass'n, "Blood Pressure," at http://www.americanheart.org/presenter.jhtml?identifier=4473 (last visited May 7, 2007).

[19]   "[F]ibrillation in which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall; the ventricles respond irregularly to the dysrhythmic bombardment from the atria."  Stedman's Medical Dictionary at 668.

24

The ME also did not support these doctors' opinions. Specifically in addressing Dr. Sastry's letter, she testified:

> Diabetes mellitus, this is type II. It is quite mild. She's not on diabetic medication. Her hemoglobin A1C . . . have all been within a normal range. So, the diabetes, I would not consider to be a significant impairing diagnosis. The second diagnosis that she lists is hypertension. In fact, she may have had some hypertension, but it is presently under good control. I don't have any elevated blood pressure readings in recent times to refer to. She is on high doses of medication because the third diagnosis of atrial fibrillation requires diltiazem and atenolol, which are also blood pressure medications. So, the next diagnosis that Dr. [Sastry] mentions is atrial fibrillation, which the Claimant does have. She's on a rate controlled strategy, meaning that she's taking medications to control the rate, which apparently is under reasonably good control, except when she underwent the recent stress of the colonoscopy at which point apparently the heart rate went out the ceiling.
>
> . . . The next diagnosis listed, by Dr. [Sastry], is hypothyroidism. We have multiple evaluations of thyroid function in the chart, and they are normal at the time that I had it because she's on Levothroid. So, the thyroid is functioning normally with medication. That is a diagnosis. And the last diagnosis she lists is osteoarthritis. And she's listing that as kind of a default diagnosis trying to explain the multiple symptoms that the patient has. We do not have extensive x-rays of her joints, although we have many x-rays of her shoulders. We have CT scans. We have x-rays of other organs, but we do not have specific x-rays dealing with the arthritic problem. But, she has had probably over the last several years, I'm looking at a likelihood of several 100 physician visits during this period of time. And so, she has been very carefully looked at and all attempts have been made to control her symptoms with limited success.

Tr. 72-73.

The court finds the Tenth Circuit reasoning appropriate here:

> [It] may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e.,

25

where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

Hackett v. Barnhart, 475 F.3d 1166, 1175 (10th Cir. 2007) (quoting Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004)).  It is clear that the ALJ considered these opinions, because they are discussed in her decision.  See Tr. 16-17.  But because these opinions, on an issue reserved to the ALJ, are unsupported and contrary to the ALJ's ultimate finding, the court finds no reversible error in the ALJ failing to articulate her weighing of them.

5.  Credibility

The ALJ is required to make credibility determinations about allegations of pain or other nonexertional disabilities.  See Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).  Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01, provides:

It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

Id. at 34486.  An ALJ's assessment of a claimant's credibility regarding the severity

of pain is entitled to great weight when it is supported by the record.  See Shively v.

Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).

The ALJ concluded that Plaintiff's allegations regarding her limitations were

not totally credible, Tr. 19, but Plaintiff complains that the ALJ failed to conduct the

above analysis.  Defendant counters that the ALJ duly considered the factors set

forth in Section 404.1529(c)(3),[20] although he concedes the ALJ neglected to discuss

Plaintiff's functional limitations and daily activities.[21]  Defendant also notes the ALJ

referred to the ME's testimony that Plaintiff's impairments were under good control

---

[20]  (i)  Your daily activities;
(ii)  The location, duration, frequency, and intensity of your pain or other
symptoms;
(iii)  Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication you
take or have taken to alleviate your pain or other symptoms;
(v)  Treatment, other than medication, you receive or have received for relief
of your pain or other symptoms;
(vi)  Any measures you use or have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every
hour, sleeping on a board, etc.); and
(vii)  Other factors concerning your functional limitations and restrictions due
to pain or other symptoms.

§ 404.1529(c)(3).

[21]  Defendant refers this court to a Second Circuit district court case in an attempt to
excuse this oversight.  But in addition to not being binding precedent, see John S. Clark Co.
v. United Nat'l Ins. Co., 304 F. Supp. 2d 758, 761 n. 1 (M.D.N.C. 2004), Defendant does
not correctly cite the Massachusetts court.  In Reeves v. Barnhart, 263 F. Supp. 2d 154 (D.
Mass. 2003), the court found the ALJ had properly considered the credibility factors "in her
decision and specifically referenced Plaintiff's testimony in assessing Plaintiff's credibility."
Id. at 163 (emphasis added).  The ALJ here made no references to Plaintiff's testimony.

and that her subjective complaints exceeded the objective medical evidence. See Tr. 17; see also Tr. 72. The ALJ further noted the agency experts' opinions that Plaintiff could perform "medium" work.[22] Tr. 17; see also Tr. 653, 674.

What concerns the court, however, is the ALJ's complete disregard for Plaintiff's subjective complaints. In a transcript exceeding 800 pages, the ALJ's sole references to Plaintiff's statements are to a hospitalization just after her AOD, and an office visit in October 2004. Particularly troublesome to this court is the question of Plaintiff's osteoarthritis. As explained by the ME, it is a "default diagnosis," but apparently one which Plaintiff's physicians determined and treated symptomatically, if sparingly. Even though the ME found Plaintiff's complaints exceeded her objective findings, Ruling 96-7p provides that "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." 61 Fed. Reg. at 34487.

As to the experts' RFC opinions, the latest was offered more than a year before the ALJ's decision, and neither addressed Plaintiff's complaints of joint pain. See Tr. 653, 680. Further, Plaintiff testified extensively as to her pain complaints. She could not use her hands because of pain and swelling. Tr. 47. Plaintiff stopped working because of pain in her back, legs, neck, and hands. Tr. 48. Even during the hearing, her shoulders and neck were painful. Tr. 49. Plaintiff's feet hurt. She

---

[22] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." § 404.1567(c).

stated, "I hurt from my toes to the top of my neck, my spine, my feet, my back, my hip. . . . Something is hurting all the time." Tr. 50. Plaintiff experienced pain in her low back and hip when walking and, sometimes, when sitting. Tr. 59-60. The ME even opined that Plaintiff's osteoarthritis treatment had been met with only "limited success," Tr. 73, and that Plaintiff was "obviously highly affected" by her symptomatology, Tr. 80.

The Fourth Circuit Court of Appeals has held that "pain itself can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." Hines, 453 F.3d at 564. Because Plaintiff raises the issue of whether her osteoarthritis should have been determined to be severe, and because it appears to be the impairment that is the most symptomatic, the court finds it must remand for the ALJ to explain the basis for her rejection of Plaintiff's pain testimony to ensure that the decision is sufficiently supported by substantial evidence. See Hatcher v. Secretary, 898 F.2d 21, 23 (4th Cir. 1989) (quoting Smith v. Schweiker, 719 F.2d 723, 725 n. 2 (4th Cir. 1984)).

6. Evaluation of RFC

Plaintiff's last contention is that the ALJ erred in not performing a "function-by-function" assessment as instructed by Ruling 96-8p, 61 Fed. Reg. 34474-01. This Ruling sets forth SSA's policies and policy interpretations for the assessment of RFC for disability claimants. Id. at 34474. "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related

abilities on a function-by-function basis," specifically citing to the functions listed in subsections 404.1545(b), (c), and (d). Id. at 34475. The Ruling further explains that the assessment "must address both the remaining exertional and nonexertional capacities of the individual."[23] Id. at 34477. "Exertional capacity" is "an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately." Id.

Plaintiff appears to be arguing that the Ruling requires an ALJ to articulate in his opinion an assessment of a claimant's ability in each of the functional categories, but there is a distinction between what the ALJ must *consider* and what he must *articulate* in the decision. Ruling 96-8p contains a section entitled "Narrative Discussion Requirements" which details what an ALJ is required to articulate regarding a claimant's RFC. See id. at 34478. The section does *not* require an ALJ to discuss all of a claimant's abilities on a function-by-function basis but, rather, only to "describe the maximum amount of each work-related activity the individual can perform *based on the evidence available in the case record.*" Id. (footnote omitted; emphasis added). An earlier provision in the Ruling places an even finer point on the issue: "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that

_____

[23] The court has already addressed the issue of Plaintiff's mental RFC. See pp. 10-12, supra.

there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." Id. at 34475.

The only physical limitation or restriction mentioned in the ALJ's decision is Plaintiff's pain.[24] See Tr. 16. The ALJ then concluded that Plaintiff could lift and carry up to fifty pounds occasionally and twenty-five pounds frequently; sit for about six hours of an eight-hour workday; and stand/walk for six hours of an eight-hour workday. Tr. 18. Plainly, the ALJ failed to address the functions of lifting, carrying, pushing, and pulling; one would expect that these functions could be affected by pain. Cf. SSR 96-8p, 61 Fed. Reg. at 34477-78 (symptoms, such as pain, "often affect the capacity to perform one of the seven strength demands"). Ruling 96-8p specifically provides:

> In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:
>
> - Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
> - Include a resolution of any inconsistencies in the evidence as a whole; and
> - Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

Id. at 34478.

---

[24] Neither the ALJ, nor Plaintiff, discussed her morbid obesity. See Tr. 703-04 (233 pounds on a 63-inch frame). Accordingly, the court will assume that it has no effect on Plaintiff's RFC. Cf. SSR 02-1p, 67 Fed. Reg. 57859-02.

31

In a conversation with a state agency employee, Plaintiff stated that she could not lift heavy items or push. Tr. 162. She testified that she could not push her trash can down the driveway. Tr. 56. In Plaintiff's Disability Report, she complained that her finger joints hurt and she had difficulty using them. Tr. 165. Plaintiff added that she could not stand long. A third party contact reported that Plaintiff's pain affected her ability to care for herself. See Tr. 181. According to this friend, almost all of Plaintiff's physical activities were affected. See Tr. 185.

In February 2004, Plaintiff told Dr. Dekle that her arthritis hurt so much she could not work. Tr. 509. In May, he opined that Plaintiff's chronic pain was so severe she was precluded from working. Tr. 690. While discussing weight loss, Plaintiff told one caregiver that she was unable to exercise due to her degenerative joint disease and fibromyalgia. Tr. 608; see also Tr. 688 (noting that Plaintiff's "physical problems" limited her ability to exercise). Dr. Hochrein noted that Plaintiff was "very limited in her activities because of diffuse pain." Tr. 707. She testified that she could not stand very long, Tr. 60, and could lift a gallon of milk only if she used both hands, Tr. 62. Plaintiff used to love to dance but no longer can. Tr. 71. Obviously, Plaintiff alleged limitations as to the strength demands.

Defendant counters that the ALJ "considered" the opinions of the non-examining agency experts, and that they were consistent with her RFC determination. Clearly, the ALJ's "consideration of opinions" falls far short of the

32

explanation required by the Ruling. Thus, the court agrees the ALJ committed reversible error in failing to support her RFC decision.[25]

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is not supported by substantial evidence and the correct legal principles were not applied. Therefore, IT IS RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this recommendation. To this extent, Plaintiff's motion for summary judgment (Pleading no. 8) seeking a reversal of the Commissioner's decision should be GRANTED. To the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED. Defendant's motion for judgment on the pleadings (Pleading no. 11) should be DENIED.

_____
WALLACE W. DIXON
United States Magistrate Judge

May 21, 2007

_____

[25] It is important to note that, as Plaintiff is an individual of advanced age, and assuming transferable skills, a finding that she has an RFC for any less than medium work would require a finding of disabled under the Medical-Vocational Guidelines. See Pt. 404, Subpt. P, App. 2, Rule 202.04.

33